Filed 6/13/22 P. v. Acevedo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047973 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F28614) |
| v. | |
| LUCIANO ACEVEDO, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

Defendant Luciano Acevedo was convicted by jury of second degree murder (Pen. Code, § 187, subd. (a))[1] and assault with a firearm (§ 245, subd. (a)(2)). The jury found that, in the commission of the murder, defendant personally and intentionally discharged a firearm and proximately caused death (§ 12022.53, subds. (b), (c) & (d)). The jury also found that defendant personally used a firearm (§ 12022.5, subd. (a)) in the commission of the assault. Further, the trial court found that defendant had a prior serious felony conviction that also qualified as a strike (§ 667, subds. (a)(1) & (b)-(i)), and that he had served a prior prison term (§ 667.5, former subd. (b)). The court sentenced defendant to 70 years to life.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends that his trial counsel rendered ineffective assistance of counsel by failing to request a jury instruction regarding the killing being excused as an accident as set forth in CALCRIM No. 510. He argues that his murder conviction must be reversed as a result.

For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

Defendant was charged by first amended information with the murder of Carlos Alberto Martinez (§ 187, subd. (a); count 1) and assault with a firearm with respect to Jose Rodriguez Martinez (§ 245, subd. (a)(2); count 2). The information also alleged that defendant personally and intentionally discharged a firearm and proximately caused death (§ 12022.53, subds. (b), (c) & (d)) regarding the murder, and that he personally used a firearm (§ 12022.5, subd. (a)) regarding the assault. The information further alleged that defendant had one prior serious felony conviction that also qualified as a strike (§ 667, subds. (a)(1) & (b)-(i)), and that he had served prior prison terms (§ 667.5, subd. (b)).

### A. *The Trial*

The homicide victim, Carlos Martinez, and his girlfriend, Amy Fernandez, lived in a tent in Watsonville. Their tent was located in a slough that contained bushes, vines, and tree stumps. The slough was located behind some businesses and down a steep hill.

The victim was shot by defendant on the afternoon of June 12, 2015. The evidence reflected that prior to the incident, (1) defendant, (2) his girlfriend, (3) a childhood friend of defendant named Tiffany Ball, and (4) Ball's boyfriend John Hankins arrived in the area by vehicle. Defendant and his friend Ball proceeded down the hill into the area where the victim and his girlfriend Fernandez lived. Defendant apparently had a dispute with Fernandez. A verbal argument ensued between some of the individuals present, followed by a physical altercation. During the physical altercation, defendant hit and shot the victim. Defendant, his girlfriend, Ball, and her boyfriend fled the scene in the vehicle. Defendant was located and arrested five days later, on June 20, in Salinas.

2

The victim died from a close-range gunshot wound to the chest. He also had a laceration on the back of his head caused by a "blunt trauma." The head injury could have been caused by the head hitting any relatively hard object with an uneven surface, including being hit with the butt of a gun. The victim also had two bruises on the left side of his waistline. The bruises could have been caused by being punched or by falling onto a relatively hard object. The victim also had a puncture wound that was 0.3 centimeters in diameter on his upper body. It was a "really insignificant wound" and probably caused by a thorn, but it could have been caused by an ice pick or a really fine pointy object that barely penetrated the skin. The victim was five feet three inches tall.

At trial, the jury heard conflicting testimony about what occurred just prior to the shooting from (1) Jose Rodriguez,[2] who defendant had pointed a gun at prior to the shooting (count 2; assault with a firearm); (2) the homicide victim's girlfriend, Fernandez; (3) defendant's friend, Ball; and (4) Ball's boyfriend, Hankins.

### 1. Jose Rodriguez

Rodriguez testified that he had known the victim and the victim's girlfriend for two or more years. On the day of the incident, Rodriguez visited the victim and the victim's girlfriend at their campsite. Rodriguez eventually saw defendant at the top of the hill. Defendant aggressively stated that "[h]e wanted his drugs." Rodriguez had seen the victim's girlfriend sell "crystal meth" three or four times. Rodriguez saw two other people at the top of the hill—a woman and a man (apparently Ball and Hankins).

When defendant was halfway down the hill, Rodriguez could see a gun in defendant's hand. Defendant pointed the gun at the victim and the victim's girlfriend several times. At some point, defendant told the victim to pay him. When defendant was near the victim and arguing with the victim's girlfriend, Ball and Hankins came down the

---

[2] At trial, Rodriguez stated that his name was Jose Rodriguez Martinez and that he went by the last name of Rodriguez.

3

hill. Hankins did not join in the argument or the ensuing physical altercation. Ball, on the other hand, argued with, and tried to hit, the victim's girlfriend. The victim told defendant to calm down, and the victim tried to separate the women. Defendant hit the victim in the head with the butt of the gun, and the victim fell to his knees.

According to Rodriguez, Ball appeared to stumble into defendant's arm and then Rodriguez heard a gunshot. It appeared to Rodriguez that defendant had fired "[b]y accident because he was pushed." Prior to being pushed or bumped, defendant had his finger on the trigger and was pointing the gun at the victim from about two feet away. The victim's girlfriend had been kneeling and holding the victim at the time. Rodriguez never saw Ball on the ground. After the shooting, defendant, who appeared surprised and scared, left the scene, followed by Ball and Hankins.

Rodriguez ran up the hill and called the police. He testified that many of the things that he told law enforcement about the incident were not true.

After Rodriguez indicated at trial that he did not recall defendant hitting the victim more than once, portions of Rodriguez's testimony from the preliminary hearing were admitted into evidence. At the preliminary hearing, Rodriguez testified that defendant hit the victim, who was on the ground, several times on the back and in the abdomen with both hands, including with the hand holding the gun, with fists, and with the butt of the gun. Defendant also pointed the gun at Rodriguez and told him move over, which deterred him from intervening.

### 2. Amy Fernandez

Fernandez, who was the victim's girlfriend, testified[3] that she met defendant several years ago. Fernandez admitted she was a "middle person for narcotics sales" but denied engaging in any narcotics transactions with defendant. She acknowledged buying

---

[3] Fernandez did not testify at trial, but her videotaped testimony from the preliminary hearing and a transcript of the testimony were admitted into evidence at trial.

marijuana from defendant "a few times." Fernandez, the victim, defendant, and his girlfriend had smoked "weed" together.

Fernandez testified that on the day prior to the homicide, she loaned $25 to defendant. They were each planning to obtain additional money to go "halves" on a hotel room for themselves and apparently for their significant others. After loaning the money, Fernandez thought defendant and his girlfriend would come back to Fernandez's camp, that they would get the rest of the money together, and that they would go get the room. When Fernandez saw defendant and his girlfriend later that day, she learned that defendant and his girlfriend had gone ahead and obtained a room. They offered the shower to Fernandez and the victim. Fernandez declined. The conversation was friendly, and no one brought up the loaned money.

Fernandez saw defendant the following day. Fernandez and the victim were at their own camp. Defendant, his friend Ball, and Ball's boyfriend Hankins were near the top of the hill. Ball's boyfriend remained at the top of the hill. Fernandez never saw defendant's girlfriend during the incident.

Fernandez and Ball got into a verbal argument "about something related to [Fernandez] and the defendant." Fernandez became upset because Ball was ordering Rodriguez, who was visiting, "to stay put and not move." Fernandez testified that defendant stated the "he didn't know if he could trust [her]," which did not make sense to Fernandez.

As defendant was coming down the hill, Fernandez saw that he had a gun, which she later observed was a "small revolver." Defendant pointed it towards the tent as he angrily called the victim's name. After the victim came out of the tent and stood by Fernandez, defendant picked up a "2-by-4" and gave it to Ball. Fernandez did not remember whether she picked up an ice pick at this point. She did keep an ice pick at her camp for protection.

5

The victim got in between Ball and Fernandez. Ball attempted to hit the victim in the head with the "2-by-4." The victim and Fernandez attempted to block it. Fernandez fell back onto the ground, the victim fell face down on top of her, and Ball fell to the side of Fernandez and on top of Fernandez's arm.

Defendant came closer to the group and bent over to punch the victim twice in the back. Fernandez tried to block defendant with her leg, and she also tried to get her arm out from under Ball. Fernandez heard the victim "gasp," but she did not see what caused him to do so. She turned her head and saw defendant "retracting with the gun in his hand." The victim, who was not wearing a shirt, immediately had bruising on the left side of his ribs. Based on the way defendant was moving his arm back, it appeared he had just punched the victim. At some point while Fernandez and the victim were on the ground, defendant pointed the gun at them.

Fernandez turned her head again to try to get her arm out and then heard a loud "ring." She looked at defendant who appeared surprised and angry. Within seconds, defendant ran off. Fernandez saw the victim bleeding and also saw a cut or gash to the back of his head before she turned him over.

### 3. Tiffany Ball

Ball testified that she knew defendant when he was a child. She next saw him in June 2015, at a Watsonville motel the day prior to the homicide. Defendant had a room with his girlfriend, and Ball and her boyfriend, Hankins,[4] went to the room. Hankins brought methamphetamine, and "[e]verybody had some. Ball and Hankins stayed in the room for less than an hour.

---

[4] By the time of trial in November 2016, Ball and Hankins were engaged to be married.

6

The following day, as Ball and Hankins were leaving the motel, they offered defendant and his girlfriend a ride. Defendant eventually asked Hankins to drive to an area near the slough.

Defendant exited the vehicle and went to talk to Fernandez, whose camp was down the hill. Defendant and Fernandez exchanged words. Ball went down to the camp because she wanted defendant and Fernandez to "move along with whatever they were discussing because [Ball] needed to go back to work." The victim came out of a tent and stood by Fernandez. Defendant's voice was serious, and Fernandez's voice started to sound aggressive.

Fernandez started walking away, and Ball followed her. Ball knew Fernandez "well enough" that she thought she could "calm the situation a little." However, Fernandez turned around with an ice pick and tried to stab Ball. Ball used both hands to grab Fernandez's arm in the air.

The victim came over, grabbed both women's wrists, and got in between them. Ball thought the victim might have been trying to stop Fernandez. All three fell down in the struggle. According to Ball, she was on the bottom, the victim was on his left side on top of her, and Fernandez was on top of Ball and in front of the victim. As Ball struggled to get out, she saw defendant kick the victim's buttocks twice. Ball saw defendant holding a pistol at the time.

Ball was able to get out from underneath the victim, and the victim also started to get up. Fernandez remained on the ground "[n]ot doing anything." Ball testified that Fernandez was not a threat to her (Ball) at that point, nor was the victim. Ball was no longer concerned about the ice pick anymore.

Defendant punched the victim from behind with both hands while holding the gun in his left hand. Defendant punched the victim while the victim was on the ground, as he was standing up, and when he briefly stood up. Ball testified that when defendant hit the victim with his left hand, his hand bounced off the victim's body, and the gunshot

7

occurred. She testified that the gun went off "in the middle of a punch" and that it "was an accident." She did not think defendant shot the victim on purpose. According to Ball, at the time the victim was shot, he had his back to defendant, and he fell face down on top of Fernandez. Ball acknowledged that it was a "pretty dangerous thing" to have a gun in your hand and hit somebody with it, and that "there's a real risk that the gun is going to go off."[5]

Defendant "jumped out of there . . . like a scared cat" and left the campsite. Ball was in shock. Hankins, who had hung back and had not gotten involved in the verbal or physical altercation, departed the campsite with Ball. Defendant's girlfriend did not go down to the campsite during the entire incident. Defendant, his girlfriend, Ball, and Hankins left the scene together in the vehicle. At some point, defendant and his girlfriend exited the vehicle, and Hankins and Ball drove off. Ball testified that she and Hankins turned themselves into the police four days later in Monterey County.

At trial, Ball denied that she had picked up anything, including a "two-by-four," when she walked down the path to the camp. When interviewed by law enforcement, however, she told them that she picked up a "two-by-four" in case she needed to defend herself, but that she put it right back down. She also told law enforcement that she pushed the "two-by-four" towards the victim, tapped him with it, and dropped it. Ball never told law enforcement that Fernandez came at her (Ball) with an ice pick. Instead,

---

[5] Defendant's trial counsel objected to the prosecutor's questions about whether it was "pretty dangerous" to hit somebody with a gun in your hand and whether there was a "real risk" the gun would go off. The trial court overruled the objections and later explained to the jury, "I allowed the DA to ask those specific types of questions based on this witness giving you the opinion that she believed this was all an accident. This is not a legal opinion. This is not professional testimony. She has given you her opinion. The DA just asked her, 'What do you mean by that, you thought it was an accident?' based on these other factors. So I am going to allow you to consider that evidence. Again, this is not expert opinion. This is not a legal conclusion. You get to decide how to use this evidence."

she reported that she "didn't know who [Fernandez] was going to poke with the ice pick." She told law enforcement that when everyone was on the ground, Fernandez was not a threat, and that Ball was " 'more in fear for [Fernandez] because she was such a little thing, and she was on the bottom.' " Ball herself was five feet six inches tall. Ball further told law enforcement that defendant could have just turned around and walked away. She reported that "defendant was on top of everybody just going to town hitting" the victim. Ball reported that defendant "whacked" the victim with the gun "a few good times" and punched him in the head. Ball further told law enforcement that when the three were on the ground "like a dog pile," defendant "pulled out his gun" and "shot [the victim] in the body." However, she also told law enforcement that she was not in the pile and that she never saw the gun. Ball reported that Hankins had been at the top of the hill when the gun was fired.

At trial, Ball did not recall telling Fernandez to accept something from defendant. According to her preliminary hearing testimony, which was admitted into evidence at trial, she testified that the pair were arguing about $25, and that she yelled down for Fernandez to accept the $25 because defendant had it. She also testified that she picked up the "two-by-four" before Fernandez picked up the ice pick. Ball further testified that she thought the victim was trying to prevent Fernandez from coming at Ball with the ice pick.

### 4. John Hankins

Hankins testified that he saw defendant partway down the hill pointing a pistol into the air. Defendant and Fernandez were yelling and then Ball became involved. Fernandez held an ice pick in the air and tried to stab Ball. Ball grabbed Fernandez's wrist. The victim got in between the women, grabbed Fernandez's wrists, and tried to calm her down. The trio moved a few feet before they fell. Fernandez fell on her back, the victim fell face down on top of her, and Ball fell to the side. It appeared Fernandez was still trying to poke Ball.

9

Defendant unsuccessfully tried to pull the victim's hands off Fernandez. Defendant kicked and hit the victim while holding the gun. According to Hankins, the victim continued to hold Fernandez's hand despite being kicked and hit. Ball was also still holding Fernandez's wrist. When defendant used the hand holding the gun to hit the victim, defendant's hand bounced off and the gun fired. Defendant looked surprised, screamed, and left the campsite. Hankins testified that the shooting by defendant was an "accident." According to Hankins, when they were driving away from the scene, defendant was "freaked out," screaming, and saying, "Go, go."

Hankins was interviewed by law enforcement four days after the homicide. Hankins indicated that he had stayed at the top of the hill while Ball went down to the camp. He further stated that he had heard a "bang," but that he did not see anything, and he did not know there was a shooting until later.

Defendant did not testify at trial.

**B.** *Jury Instructions and Argument to the Jury*

During trial and outside the presence of the jury, the trial court discussed jury instructions with counsel. Defendant's trial counsel stated that all the witnesses who were in the slough testified that defendant "did not intend or did not appear to intend to fire the weapon, that it was done accidentally; and, therefore, the defendant did not intend to kill [the victim]." At a subsequent jury instruction conference, defense counsel indicated that his theory of the case was that defendant committed involuntary manslaughter because the death occurred while he was brandishing a firearm and/or while he was committing an act with criminal negligence.

Regarding the killing of the victim, the jury was instructed regarding first degree murder, second degree murder, voluntary manslaughter based on imperfect defense of another (Tiffany Ball), involuntary manslaughter, and firearm enhancement allegations. Regarding first and second degree murder, the jury was instructed that a defendant acts with implied malice if: the defendant (1) intentionally committed an act, (2) the natural

10

and probable consequences of the act were dangerous to human life, (3) the defendant knew the act was dangerous to human life, and (4) the defendant deliberately acted with conscious disregard for human life. (See CALCRIM No. 520.)

The jury was instructed that a defendant commits involuntary manslaughter if: (1) the defendant committed a crime or a lawful act in an unlawful manner, (2) the defendant committed the crime or act with criminal negligence, and (3) the defendant's acts caused the death of another person. (See CALCRIM No. 580.) The jury was further instructed that the crime of brandishing a firearm is committed if: (1) the defendant drew or exhibited a firearm in the presence of someone else, (2) the defendant did so in a rude, angry, or threatening manner, or the defendant use the firearm in a fight or quarrel, and (3) the defendant did not act in defense of someone else.

Regarding two of the firearm enhancement allegations attached to the murder count, the jury was instructed in part that the prosecutor must prove that the defendant "intended to discharge the firearm." (See § 12022.53, subds. (c) & (d) .)

At the close of evidence, the prosecutor argued to the jury that there was undisputed evidence that defendant had a gun out during the incident, that he punched the victim at least once, that he hit the victim with the gun, that the gun fired and killed the victim, and that defendant ran away from the scene. The prosecutor also contended that the evidence showed that defendant went to the scene holding a loaded gun, pointed it several times at the victim and Fernandez, hit the victim in the head with the gun, and used the hand that was holding the gun to punch the victim. The prosecutor argued that everyone would know that hitting someone with a loaded gun was behavior that was dangerous to human life, and that engaging in such behavior amounted to an intent to kill or at a minimum a disregard for human life. Apparently in reference to Ball and her boyfriend Hankins, the prosecutor argued that the only two witnesses who stated that the gun bounced off the victim and fired, seemingly without any intent by defendant to do so, were two witnesses who failed to describe the event consistently on multiple occasions.

11

Regarding the firearm allegations attached to the murder count, the prosecutor contended that defendant intentionally fired the gun. Regarding the count for assault with a firearm, the prosecutor contended that defendant had pointed the gun at Rodriguez.

Defendant's trial counsel argued to the jury that defendant did not intend to shoot or kill the victim, and that the only verdict the jury could reasonably reach was that defendant was guilty of involuntary manslaughter. Regarding the witnesses who testified, defendant's trial counsel acknowledged: "Tiffany Ball certainly does not cover herself in glory during this event or frankly during these proceedings, nobody does, not a single person does." Counsel contended, however, that Ball, Hankins, and Rodriguez each indicated the gunshot was an accident, and that Fernandez testified that defendant appeared surprised after the shot. Counsel contended that under these circumstances, there was no express malice because there was no intent to kill. Counsel also argued that there was no implied malice because the victim's death was not a natural and probable consequence of defendant swinging the gun in his hand, and there was no evidence that he knew the act was dangerous to human life. Regarding voluntary manslaughter, counsel contended that such a charge "presupposes" a defendant intended to use deadly force, but that in this case, the evidence reflected that defendant did not intend to use deadly force. Regarding involuntary manslaughter, which includes as an element that the defendant committed a crime or a lawful act in an unlawful manner, counsel conceded that defendant committed the crime of brandishing a firearm, which further meant that defendant did not act in defense of someone else. Counsel stated, "Now, folks, we're not going to argue to you that there was no crime here. Okay. That would be absurd. . . . What the evidence is and what the evidence shows, what the evidence proves is involuntary manslaughter, it wasn't murder." Counsel urged the jury to find defendant not guilty of murder and guilty only of involuntary manslaughter. Regarding the firearm enhancements for count 1, defendant's trial counsel contended that defendant did not intentionally discharge the gun.

12

**C.** *Jury Verdicts and Sentencing*

The jury found defendant guilty of the second degree murder of Carlos Martinez (§ 187, subd. (a); count 1). The jury found that, in the commission of the murder, defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and proximately caused death (§ 12022.53, subd. (d)). The jury also found defendant guilty of assault with a firearm (§ 245, subd. (a)(2); count 2), and that he personally used a firearm (§ 12022.5, subd. (a)).

In a bifurcated proceeding, the trial court found true that defendant had a prior conviction for first degree burglary that also qualified as a strike (§ 667, subds. (a)(1) & (b)-(i)), and that he had served a prior prison term (§ 667.5, subd. (b)).

The trial court sentenced defendant to 70 years to life.

## III. DISCUSSION

Defendant contends that his trial counsel should have "request[ed] a jury instruction on the defense of accident as set forth in CALCRIM [No.] 510," and that his trial counsel rendered ineffective assistance by failing to do so.

The Attorney General contends that CALCRIM No. 510 regarding an accident was not warranted by the evidence because it only applies when the defendant's conduct is entirely blameless. The Attorney General argues that here, defendant's conduct was at a minimum criminally negligent. Second, the Attorney General contends that defendant's trial counsel appropriately argued to the jury that the shooting was a combination of defendant's culpable negligence and accident, and that the jury could have found the defendant guilty of involuntary manslaughter if the jury believed the killing was partially the result of an accident. Third, the Attorney General contends that the omission of a jury instruction regarding accident was not prejudicial to defendant because other instructions covered similar legal principles and the jury ultimately found true the enhancements allegations regarding defendant having intentionally discharged a firearm.

13

**A.** *Law*

### 1. Homicide

Defendant was convicted of second degree murder. " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. [Citations.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Malice "may be either express or implied." (*Ibid.*) It is express when there is a deliberate intention to kill. (*Ibid.*) It is implied when the defendant engages in an intentional act, " ' "the natural consequences of which are dangerous to life," ' " and the defendant " ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*Ibid.*, fn. omitted; see, *People v. Lasko* (2000) 23 Cal.4th 101, 107.)

In addition to first and second degree murder, the jury was also instructed regarding voluntary manslaughter and involuntary manslaughter. Regarding voluntary manslaughter, a person who kills "in a 'sudden quarrel or heat of passion' " (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*)), or in "imperfect self-defense" or "[i]mperfect defense of others" (*People v. Trujeque* (2015) 61 Cal.4th 227, 271 (*Trujeque*))—the unreasonable belief in having to act in self-defense or in defense of others—may be guilty of voluntary manslaughter, as the element of malice is negated. (*Moye*, *supra*, at p. 549; *Trujeque*, *supra*, at pp. 270, 271.)

A person who kills without the intent to kill and without conscious disregard for life may be guilty of involuntary manslaughter. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.) Involuntary manslaughter may arise when the defendant performs an act—including a lawful act, a misdemeanor, or a noninherently dangerous felony—with the mens rea of criminal negligence, and the defendant's act causes the death of another person. (*Ibid.*) Criminal negligence occurs when the defendant engages in reckless conduct that creates a high risk of death or great bodily harm, and an

14

ordinarily prudent person would foresee that the conduct would create such a risk.  (See *id.* at p. 1008.)

## 2.  Accident

A homicide "committed by accident and misfortune" is "excusable."  (§ 195, subd. 1; see also § 26, subd. Five.)  "Generally, the claim that a homicide was committed through misfortune or by accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime.'  [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 674.)  As explained by the California Supreme Court, " 'accident' " is not an affirmative defense and is instead "a request for an instruction that negates the intent element of malice murder.  [Citation.]" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199, fn. 3 (*Gonzalez*).)

A trial court generally does not have a sua sponte duty to instruct on the issue of accident.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996; see *id.* at p. 997.)  "A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.  [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40; accord, *Gonzalez, supra*, 5 Cal.5th at p. 199, fn. 3.)

CALCRIM No. 510 addresses a killing that resulted from an accident.  At the time of defendant's trial in 2016, former CALCRIM No. 510 stated:

"The defendant is not guilty of (murder/ [or] manslaughter) if (he/she) killed someone as a result of accident or misfortune.  Such a killing is excused, and therefore not unlawful, if:

"1.  The defendant was doing a lawful act in a lawful way;

"2.  The defendant was acting with usual and ordinary caution;

"AND

"3.The defendant was acting without any unlawful intent.

"A person acts with *usual and ordinary caution* if he or she acts in a way that a reasonably careful person would act in the same or similar situation.

15

"The People have the burden of proving beyond a reasonable doubt that the killing was not excused. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter)." (CALCRIM No. 510 (2012).)

### 3. Ineffective Assistance of Counsel

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

### B. *Analysis*

Defendant fails to demonstrate that his trial counsel rendered ineffective assistance of counsel by failing to request CALCRIM No. 510 regarding accident.

First, trial counsel's failure to request CALCRIM No. 510 may have been the product of " ' "sound trial strategy." ' " (*Lopez, supra*, 42 Cal.4th at p. 966.)

The witnesses who testified about the events just prior to the shooting were inconsistent with respect to each other, and with respect to what they previously stated to law enforcement or what they testified to at the preliminary hearing. For example,

Rodriguez testified at trial that just before the shooting, Ball was standing, and he never saw her on the ground during the incident. Rodriguez further testified that the gunshot appeared to be an accident, because Ball stumbled and pushed defendant and the gun fired thereafter. In contrast, Fernandez testified at trial that Ball was already on the ground when the gunshot occurred. Further, Ball and her boyfriend Hankins made no mention of Ball bumping into defendant, and the pair instead testified at trial that the gunshot occurred when defendant's hand bounced off the victim after defendant had hit the victim. In further contrast, Ball previously told law enforcement that defendant "pulled out his gun" and "shot [the victim] in the body." Hankins, in contrast to his trial testimony, told law enforcement that he had stayed at the top of the hill, that he did not see anything, and that he did not know there was a shooting until later.

Further, although Rodriguez, Ball, and Hankins each indicated at trial that the shooting was an accident, they also provided testimony that indicated the shooting occurred while defendant was engaging in unlawful behavior. For example, Rodriguez testified that defendant, prior to being bumped by Ball, had his finger on the trigger and was pointing the gun at the victim from about two feet away as if defendant was going to shoot.

Ball, meanwhile, testified at trial that the shooting occurred after she and the victim had separated from the pile on the ground, and that the victim and Fernandez were no longer a threat to Ball. Defendant, however, continued to punch the victim, including with the hand that was holding the gun, until the gun fired. Ball likewise told law enforcement that when everyone was on the ground, Fernandez was not a threat, and that Ball was " 'more in fear for [Fernandez] because she was such a little thing, and she was on the bottom.' " Further, according to Ball's testimony from the preliminary hearing, which was introduced at trial, Ball thought the victim was actually trying to prevent Fernandez from coming at Ball with the ice pick. Hankins similarly testified at trial that, while Ball and the victim were on the ground holding onto Fernandez's wrist or hand,

17

defendant was kicking and hitting the victim while holding the gun. Thus, Hankins's and Ball's testimony and/or prior statements indicated that Ball was not in need of defense by defendant at the time of the shooting, and Rodriguez's testimony established that defendant was brandishing a firearm at the time of the shooting.

Defendant's trial counsel seemingly recognized the many problems with the various witnesses' testimony, by stating in argument to the jury: "Tiffany Ball certainly does not cover herself in glory during this event or frankly during these proceedings, nobody does, not a single person does." Further, in argument to the jury regarding involuntary manslaughter, which includes as an element that the defendant committed a crime or a lawful act in an unlawful manner, counsel conceded that defendant committed the crime of brandishing a firearm, which as instructed to the jury, meant that defendant did not act in defense of someone else. Counsel admitted frankly, "Now, folks, we're not going to argue to you that there was no crime here. Okay. That would be absurd. . . . What the evidence is and what the evidence shows, what the evidence proves is involuntary manslaughter, it wasn't murder." Counsel's argument to the jury echoed his earlier statement to the trial court during a jury instruction conference regarding the defense theory of the case. Specifically, the defense theory was that defendant committed involuntary manslaughter because the death occurred while defendant was brandishing a firearm and/or while he was committing an act with criminal negligence.

Defendant on appeal, in contending that CALCRIM No. 510 regarding accident should have been requested by his trial counsel, merely cites a few portions of the lay witnesses' testimony and the argument of his trial counsel which characterize the shooting as an accident. As set forth above, however, former CALCRIM No. 510 (2012) requires more than just lay opinion or attorney argument that the killing was an "accident." For an "accident" to "excuse[]" a killing, the defendant must have been "doing a lawful act in a lawful way" and "acting with usual and ordinary caution." (*Ibid.*) "A person acts with *usual and ordinary caution* if he or she acts in a way that a

18

reasonably careful person would act in the same or similar situation." (*Ibid.*) On appeal, defendant fails to identify what evidence would support a finding that he was "doing a lawful act in a lawful way" and "acting with usual and ordinary caution" at the time the gun fired on the victim. (*Ibid.*) The evidence instead overwhelmingly reflected that defendant was brandishing a firearm and/or physically attacking the victim, including hitting the victim with the hand holding the gun, at the time the gun fired.

On this record, given the numerous inconsistencies between and by the witnesses about what happened immediately prior to the shooting, and in view of defendant's trial counsel's frank acknowledgment to the jury about issues with the witnesses and about defendant having committed the crime of brandishing a firearm prior to the shooting, counsel may have reasonably been attempting to maintain credibility with jury by arguing that it should return a verdict on the lesser offense of involuntary manslaughter instead of murder, rather than straining credulity with an argument (and instruction) on accident under former CALCRIM No. 510. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335 (*Bolin*) ["[c]onceding some measure of culpability" may be a valid tactical choice]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061 (*Mitcham*) ["good trial tactics often demand complete candor with the jury," and "in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"].) Even on appeal, defendant appears to recognize the weaknesses in calling the shooting an "accident" as legally defined in former CALCRIM No. 510. In this regard, defendant asserts that the instruction should have been requested by trial counsel because it was "a simple thing to request, and at worst all that would have happened would be that the trial court would decline to give the instruction." In view of the record as we have described, this is not a persuasive argument to support the contention that trial counsel was ineffective for failing to request former CALCRIM No. 510 regarding accident. (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make

motions or objections that counsel reasonably determines would be futile."]; *Bolin*, *supra*, 18 Cal.4th at p. 335; *Mitcham*, *supra*, 1 Cal.4th at pp. 1060-1061.)

Second, even assuming trial counsel should have requested former CALCRIM No. 510 regarding accident, defendant fails to establish that he was prejudiced by counsel's failure to do so. On this point, defendant does *not* argue that there is a " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*Lopez*, *supra*, 42 Cal.4th at p. 966.) Indeed, we agree with the Attorney General that defendant has not established such a " ' "reasonable probability." ' " (*Ibid.*)

The failure to give a requested instruction may be "harmless under the standard articulated in either *Chapman v. California* (1967) 386 U.S. 18, 36 (error is prejudicial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (error is prejudicial if it is reasonably probable the defendant would have obtained a more favorable result absent the error). [¶] Harmless error analysis is appropriate when, in the circumstances, it can be said that assuming instructional error, ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' [Citation.]" (*People v. Scully* (2021) 11 Cal.5th 542, 594-595 (*Scully*).)

As we set forth above, former CALCRIM No. 510 regarding accident applies when the "defendant was doing a lawful act in a lawful way," "was acting with usual and ordinary caution," and "was acting without any unlawful intent." Here, in connection with two firearm enhancement allegations, the jury found true that defendant intended to discharge the firearm (see § 12022.53, subds. (c) & (d) [a person who, in the commission of murder, "intentionally discharges a firearm"]). "These explicit findings demonstrate that the jury necessarily rejected defendant's argument that he accidentally shot the [victim]." (*Scully*, *supra*, 11 Cal.5th at p. 595.) As the failure to give former CALCRIM

20

No. 510 regarding accident would have been harmless in this case (see *Scully*, *supra*, at pp. 594-595), it necessarily follows that defendant cannot show prejudice by trial counsel's failure to request the instruction for purposes of defendant's claim of ineffective assistance of counsel.

In view of the record, we also find unpersuasive defendant's contention regarding the prejudice prong of his ineffective assistance claim that trial counsel's deficient performance rendered the proceedings fundamentally unfair (see *Lockhart v. Fretwell* (1993) 506 U.S. 364, 372; *In re Harris* (1993) 5 Cal.4th 813, 833). In this regard, defendant argues that the trial proceedings were fundamentally unfair because the jury had evidence regarding accident but were not "given the opportunity to make a decision on this significant issue."

Assuming, without deciding, that the fundamental unfairness standard applies in this context, we are not persuaded by defendant's argument. As we have explained, defendant fails to identify the evidence that would have supported a finding that the killing was an accident pursuant to the legal principles set forth in former CALCRIM No. 510, which provides that a killing is excused if the " defendant was doing a lawful act in a lawful way," "was acting with usual and ordinary caution," and "acting without any unlawful intent." In this case, to the contrary, the evidence overwhelmingly showed that defendant was *not* doing a lawful act in a lawful way and was *not* acting with usual and ordinary caution at the time the gun fired. Further, the jury's findings regarding the firearm enhancements reflect the jury's belief that defendant intentionally discharged the firearm and thus acted with unlawful intent. On this record, defendant fails to persuasively demonstrate that trial counsel's failure to request former CALCRIM No. 510 regarding accident rendered the proceedings fundamentally unfair.

Accordingly, we determine that defendant fails to establish a basis for reversal of his murder conviction.

21

## IV. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*People v. Acevedo*
**H047973**